UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 SEP 14  PM 4: 33

CLERK

BY _____
DEPUTY CLERK

WAYNE BURWELL,                                      )
                                                   )
            Plaintiff,                             )
                                                   )
    v.                                             )     Case No. 5:12-cv-166
                                                   )
HARTFORD POLICE OFFICER FREDRICK                   )
PEYTON in his individual capacity and as an        )
employee of the Town of Hartford, HARTFORD         )
POLICE OFFICER SCOTT MOODY in his                  )
individual capacity and as an employee of the Town )
of Hartford, HARTFORD POLICE OFFICER               )
KRISTINNAH ADAMS in her individual capacity        )
and as an employee of the Town of Hartford,        )
HARTFORD POLICE CHIEF GLENN CUTTING                )
in his individual capacity, and TOWN OF            )
HARTFORD for the negligence of Emily Leinoff       )
and Martha Morse,                                  )
                                                   )
            Defendants.                            )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**
(Docs. 80 & 81)

Plaintiff Wayne Burwell ("Plaintiff") brings this action pursuant to 42 U.S.C.
§ 1983 and state law against the Town of Hartford ("Hartford"), Hartford Police Chief
Glenn Cutting ("Chief Cutting"), and Hartford police officers Kristinnah Adams
("Officer Adams"), Fredrick Peyton ("Officer Peyton"), and Scott Moody ("Sergeant
Moody") (collectively, "Defendants") for their actions stemming from an incident on
May 29, 2010 during which the individual officers responded to a 911 call at Plaintiff's
residence.  It is uncontested that the officers pepper-sprayed and beat Plaintiff with a
baton in his own residence while Plaintiff was experiencing a hypoglycemic event
triggered by a medical condition.  It is also undisputed that the officers responded to a

call that Plaintiff's residence appeared "ransacked" and that there was an unknown male inside.

Pending before the court are motions for summary judgment filed by Defendants. (Docs. 80 & 81.) Defendants contend that they are entitled to judgment as a matter of law in their favor on all of Plaintiff's claims because they had probable cause to seize Plaintiff, he was not conscious of any confinement, the officers' use of force was reasonable and privileged, and the individual officers are entitled to qualified and statutory immunity. Plaintiff opposes the motions, asserting that there are disputed issues of material fact and that Defendants are not entitled to judgment as a matter of law.

Plaintiff is represented by Robin C. Curtiss, Esq., Ines C. Rousseau, Esq., Jeffrey J. Larrimore, Esq., and Edward M. Van Dorn, Esq. Defendants are represented by Nancy G. Sheahan, Esq., Kevin J. Coyle, Esq., Joseph A. Farnham, Esq., and James F. Carroll, Esq.

## I.    Procedural Background.

The court heard oral argument on Defendants' motions on January 30, 2015, at which time the court ordered Defendants to submit a transcript of an audio recording from the body microphone of Officer Adams previously submitted as evidence.[1] There is a partial video recording of the incident which was taken from the vantage point of a police cruiser and which captures only some of the events in question. There is no video recording depicting what transpired in Plaintiff's residence.

On May 8, 2015, Defendants submitted the requested transcript prepared by a court reporter, after affording Plaintiff an opportunity to review it. Plaintiff, however, contests the accuracy of the transcript and proffers a competing version of how discrepancies and inaudible portions within it may be resolved. The parties have now submitted three versions of proposed revisions to the transcript of the audio recording which they apparently agree does not accurately reflect what can be heard on the audio

---

[1] The court also granted Defendants thirty days to submit a statement of disputed facts in response to Plaintiff's statement of undisputed facts, which Defendants filed on February 25, 2015. (Doc. 112.)

recording. Because the court cannot reconcile these competing revisions without making findings of fact, it relies primarily on the audio recording in setting forth the relevant facts.

Plaintiff's Second Amended Complaint asserts five claims pursuant to 42 U.S.C. § 1983: Count One against the individual officers for excessive force; Count Two against the individual officers for "detention and confinement"; Count Three against the individual officers for false arrest; Count Four against Hartford for establishing and maintaining customs, policies, or practices which gave rise to violations of Plaintiff's constitutional rights; and Count Five against Chief Cutting for supervisory liability.

Plaintiff's Second Amended Complaint asserts four claims against Hartford: Count Six for the negligence of the individual officers; Count Seven for the negligence of Chief Cutting; Count Eight for negligent training, retention, and supervision; and Count Twelve for the negligence of Emily Leinoff and Martha Morse (Hartford's 911 dispatchers on call the date of the incident). Because Plaintiff did not oppose Defendants' request for dismissal of Counts Eight and Twelve, the court dismissed those counts at oral argument and Ms. Leinoff and Ms. Morse are no longer defendants in this lawsuit. (Doc. 111.)

Finally, Plaintiff's Second Amended Complaint asserts three state law claims against the individual officers and Hartford: Count Nine for intentional infliction of emotional distress; Count Ten for negligent infliction of emotional distress; and Count Eleven for assault and battery.

## II.    The Undisputed Facts.

### A.    Plaintiff's Prior Medical Crisis.

Prior to the incident in question, on March 28, 2010, the Hartford Fire Department and emergency medical services were dispatched to Plaintiff's residence to resolve "a blood sugar issue."[2] (Doc. 98-3 at 26, ¶ 144.) Plaintiff was found in the bedroom of his

---

[2] At that time, the Hartford Fire Department and the Hartford Police Department were on separate computer-aided dispatch ("CAD") systems so that a reported call from an apartment or condominium did not provide an alert regarding whether or why there had been a prior response

residence supine, salivating, and unresponsive, with a blood sugar level of 24.  (Doc. 98-5 at 1.)  The emergency medical technicians ("EMTs") who responded, Alan Beebe and Robert Robishaw, were unable to administer glucose orally and observed that, at the time, Plaintiff could not stand or "take anything orally" and that Plaintiff "was not fighting back" while being treated.  (Doc. 98-34 at 2; Robishaw Dep. at 26:4-13.)  The EMTs gave Plaintiff a shot of glucagon and intravenous fluids (an "IV"), after which Plaintiff became "alert" and "responsive" but was still "confused" and had difficulty recalling what had occurred that day.  (Doc. 98-5 at 1; Doc. 98-42 at 2-3.)  Plaintiff was then able to take glucose orally, but Plaintiff needed assistance standing and getting dressed.

Mr. Robishaw testified in deposition that on that occasion Plaintiff "was in an unconscious state responding only to painful or loud stimuli," and he opined that generally a person with a blood sugar reading of 24 and an 8 Glasgow Coma Scale would be in an unconscious state.  (Doc. 98-34 at 3-4; Robishaw Dep. at 27:22-28:2.)  After the EMT's initial treatment, Plaintiff was transported to the hospital.

### B.   The Housekeepers' Report to the Dispatcher.

In the afternoon of May 29, 2010, Hartford dispatcher Emily Leinoff (the "Dispatcher") received a transfer of a 911 call from an agent in Williston, Vermont.  The call agent advised the Dispatcher that she had received a call from an employee of a cleaning service who had entered a client's residence at 34 Stony Creek in Wilder, Vermont with another housekeeper.  The call agent further advised that the housekeepers reported that they found the place "ransacked," and that when they opened the door to the upstairs bathroom, they saw a person in the bathroom who "does not belong to the residence" and who "was just sitting on the toilet."  (Doc. 98-8, Ex. 5 at 00:40.)

---

to a specific apartment or condominium number.  The CAD system did note the number of "previous calls" for the address associated with the apartment or condominium complex, but not the substance of those calls.  (Doc. 84-12 at 5, 6; Boutilier Dep. at 12:6-16, 13:14-24.)

4

One of the two housekeepers, Holly Thomas, subsequently spoke directly with the Dispatcher.[3]  Ms. Thomas explained that she rang the doorbell of the residence in question, opened the door and said "hello" a couple times, and that no one responded. Ms. Thomas stated that the two housekeepers then went upstairs where she smelled something burning and observed an overturned lamp and alarm clock there were "burning into something." (Doc. 98-8, Ex. 5 at 01:24-01:32.) The housekeepers picked up the lamp which was no longer smoking. Ms. Thomas further reported that the other housekeeper opened the door to the bathroom, where the lights were off, and saw a person sitting on the toilet. She described the person as a "black male" who did not say anything to them or look at them when they opened the bathroom door. (Doc. 98-8, Ex. 5 at 05:30-06:10.) Ms. Thomas told the Dispatcher: "[W]e don't know if it's the person that owns the house, that . . . may be sick or something, or . . . what's going on." (Doc. 98-8, Ex. 5 at 01:39-01:45.) The Dispatcher did not hear this statement at that time, although she conceded in her deposition that the statement can be heard on the recording of the 911 call. (*See* Doc. 84-1 at 15-16, Leinoff Dep. at 28:14-29:4.)

Ms. Thomas repeatedly informed the Dispatcher she had never seen or met the owner of the residence, and she further stated that she did not know the resident's name. (*See, e.g.*, Doc. 98-8, Ex. 5 at 06:18; *see also* Doc. 98-6 at 2, Thomas Dep. at 16:3-5.) She also stated that she had not seen the male leave the residence. When asked by the Dispatcher if the house was ransacked, Ms. Thomas replied that "it looked messy on the first floor."[4] (Doc. 98-8, Ex. 5 at 04:13-04:25.) When asked if the housekeepers had keys to the condominium, Ms. Thomas replied that her boss had keys, that the residence

---

[3] The other housekeeper who entered the residence, Hallie Fortune, did not speak with the Dispatcher but did speak with the call agent, stating that she was not sure if the male she saw in the bathroom was the homeowner and that the house was "a mess," which it was "never like." (Doc. 98-7 at 3-4, Fortune Dep. at 28:21-29:12.) Ms. Fortune had never met or seen Plaintiff prior to this incident. She left the residence before the officers responded to the 911 call and was not at the residence during the incident in question.

[4] The remainder of Ms. Thomas's response to the Dispatcher's question is inaudible on the audio recording.

was unlocked, and that she did not know "if they left it unlocked or if someone broke in to it." (Doc. 98-8, Ex. 5 at 05:05-05:20.)

Sergeant Moody[5] was present when the Dispatcher received the 911 call. The Dispatcher informed Sergeant Moody that the call reported a person inside a residence at Stony Creek, that the cleaning crew did not know "who the person [was]," that there was smoke inside this residence, and that the residence looked "ransacked." (Doc. 84-1 at 17, Leinoff Dep. at 32:13-17; *see also* Doc. 84-3 at 4, Moody Dep. at 7:4-9.) The Dispatcher reported to Sergeant Moody that the cleaning crew believed the unidentified man "may have broken in." (Doc. 84-3 at 5, Moody Dep. at 12:13-22.) The Dispatcher did not report to Sergeant Moody that Ms. Thomas thought the man they observed in the bathroom might be "sick or something" because she had not heard that statement. (Doc. 84-1 at 18-20, Leinoff Dep. at 34:18-36:11.) Although she was aware that Ms. Thomas did not know the owner of this residence or his name, she did not report this information to Sergeant Moody because she did not think this information was relevant. Sergeant Moody stated that if he had been told that Ms. Thomas reported she did not know who lived there and the man in the bathroom may be sick, he "may" have responded differently by attempting "to determine who lived there maybe from the neighbors" before entering the residence. (Doc. 98-11 at 9-10, Moody Dep. at 17:23-18:12.) He also conceded that he may have been able to discover that a black male lived in the residence if he asked questions outside the residence prior to entering it. (*See* Doc. 98-11 at 19-20, Moody Dep. at 50:18-51:6.)

Officers Adams and Peyton[6] were in the squad room at the Hartford police station when Sergeant Moody informed them that Dispatch had received a 911 call regarding a

[5] Sergeant Moody has been certified by the Vermont Criminal Justice Training Council ("VCJTC") as a full-time police officer in the State of Vermont and has successfully completed the basic training mandated by the VCJTC for all full-time law enforcement officers. Sergeant Moody has also attended several drug investigation schools and a three-day course in basic crime scene investigation and has received training in areas such as basic high risk entry, interview and interrogation, and tactical and operational training.

[6] Officers Adams and Peyton have been certified by the VCJTC as full-time police officers in the State of Vermont and each has successfully completed the basic training mandated by the

6

burglary in progress. Officer Adams was told that "the house looks ransacked and that they believe he's still in the house." (Doc. 84-8 at 3, Adams Dep. at 14:7-19.) Because Officer Adams was not told that a housekeeper made the 911 call, she assumed that the call had been made by the owner or resident reporting an unidentified person in his or her residence. Officer Peyton was told that "a cleaning lady inside the building . . . didn't recognize an individual inside the building and that the place may be . . . burglarized at this time." (Doc. 84-5 at 5, Peyton Dep. at 8:11-16.)

While the officers prepared for the call and were en route to the scene, the Dispatcher was still on the 911 call. She spoke with the owner of the housecleaning service, Jennifer Dean, who stated that she planned to enter the residence to ascertain what had happened because she did not want to get in "trouble" and lose the "job." (Doc. 98-8, Ex. 5 at 06:50-07:03.) She stated that she did not know why her crew had not waited for her arrival before calling 911. (Doc. 98-8, Ex. 5 at 06:50-07:03.) The Dispatcher told her, "Do not go in right now," to which Ms. Dean replied, "I don't even know why they called you." (Doc. 98-8, Ex. 5 at 08:01-08:19.) Ms. Dean informed the Dispatcher that she knew the owner of the residence and that his name was "Wayne." (Doc. 98-8, Ex. 5 at 08:02.) After several minutes of conversation between the Dispatcher and Ms. Dean, the officers arrived at Plaintiff's condominium complex. The Dispatcher did not update the officers regarding the resident's name or that Ms. Thomas reported that the bedroom was no longer smoking.

### C.    The Hartford Officers' Response at the Scene.

Officer Peyton arrived first on the scene and encountered Ms. Thomas, Ms. Dean, and an unidentified male standing outside Plaintiff's residence which is located in a condominium complex. Officer Peyton spoke with Ms. Thomas, who reported that

---

VCJTC for full-time law enforcement officers. In addition, Officer Peyton has received training in active shooter-rapid deployment, street survival, forensic interview and interrogation, pro-active criminal enforcement and methamphetamine awareness training, as well as drug recognition training. Officer Adams has received training in active shooter-rapid deployment and forensic interviewing. Officer Peyton has successfully completed training on the use of pepper spray through the VCJTC, and Officer Adams is certified in the use of pepper spray.

"there's a man in the building, I don't know who he is, the place looks ransacked[,] and I'm scared." (Doc. 84-5 at 10, Peyton Dep. at 21:14-19.) Officer Peyton spoke with Ms. Thomas for approximately twenty seconds. He did not ask Ms. Thomas who owned or lived in the residence or ask for a description of the homeowner or resident. He knew, however, that Ms. Thomas did not reside there. In deposition, Officer Peyton acknowledged that it would be "important" to know who lived in the residence. (Doc. 98-13 at 8-9, Peyton Dep. at 38:20-39:1.) While Ms. Thomas never stated that she believed the man in the residence was a burglar, Officer Peyton "surmised" he was based on Ms. Thomas's description that the residence was "a mess" and "looked ransacked." (Doc. 84-5 at 12-13, Peyton Dep. at 25:23-26:15.)

Sergeant Moody, the second Hartford officer to report to Plaintiff's residence, did not speak with Ms. Thomas. Officer Peyton, however, relayed to Sergeant Moody that Ms. Thomas advised that she was part of a cleaning crew for the residence and did not know the male inside. Sergeant Moody knew that Ms. Thomas was not the owner or resident, but he "assume[d] that if she cleans there she knows who lives there." (Doc. 98-11 at 12, Moody Dep. at 30:11-16.) While he was not sure if Ms. Thomas reported that it looked like a burglary, he was aware that Ms. Thomas had told Officer Peyton that "[i]t looks like somebody broke in or [it] was ransacked." (Doc. 98-11 at 12, Moody Dep. at 30:19-20.) Sergeant Moody did not ask who lived in or owned the residence, did not ask for a description of that person, and did not ask the bystanders if they knew the resident or owner. (*See* Doc. 84-3 at 7, Moody Dep. at 16:1-20.)

Officer Adams arrived on the scene thereafter. She did not speak with the three individuals standing outside Plaintiff's residence. Officer Adams had "no idea" who Ms. Thomas was (Doc. 98-16 at 4), but she assumed that Ms. Thomas lived at the residence and that Ms. Thomas "must know who belonged in there and who didn't[.]" (Doc. 84-8 at 4, Adams Dep. at 17:15-22.) Officer Adams testified that she did not believe the circumstances warranted further investigation.

Ms. Dean was standing outside with Ms. Thomas when the officers arrived. None of the officers asked Ms. Dean if she knew who owned or lived at the residence. The

8

officers also did not speak with any of the other residents of the condominium complex or bystanders regarding whether they knew the occupant, although the video recording depicts various bystanders watching the incident unfold.

Officer Peyton drew his firearm and proceeded to walk up the steps to a small landing in front of the front door to Plaintiff's residence. Officer Adams approached the stairs behind him, confirmed with Ms. Dean and Ms. Thomas that the unidentified man was upstairs, and instructed Ms. Dean, Ms. Thomas, and other male individual to calm down and to remain outside. Officer Adams then drew her firearm, prompting either Ms. Dean or Ms. Thomas to ask, "Why do you have a gun out?" (Tr. at 3:5.)[7] Officer Adams testified that she was not surprised by the question because people ask her "that all the time" and "people innately can be threatened just by the presence of the gun." (Doc. 84-8 at 6-7, Adams Dep. at 19:16-20:5.) Officer Peyton replied: "It's just that I don't know who the hell this guy is. . . . I don't know this guy." (Tr. at 3:6-9.)

Sergeant Moody retrieved a service rifle from his vehicle and thereafter joined Officers Adams and Peyton on the front landing. The three officers conferred and agreed that the man might still be in the upstairs bathroom. There was no sign from the front of Plaintiff's residence of a forced entry.

Before the officers entered Plaintiff's residence, Bob McKaig, Plaintiff's neighbor, emerged from his residence. As he stood on his own landing adjacent to Plaintiff's landing, he asked the officers if they were "trying to get Wayne?" (Tr. at 3:18.) Ms. Thomas can be heard stating: "We went in there. We were scared." (Tr. at 3:20.) As the officers opened Plaintiff's front door, a fire alarm can be heard emanating from inside Plaintiff's residence. Mr. McKaig told the officers: "They found him in -- a couple weeks ago unconscious upstairs. You might want to check the bedroom." (Tr. at 3:23-25.) Ms. Thomas can be heard stating: "We got scared, see. . . . We got scared. When we got in there, it looked ransacked." (Tr. at 4:5-6.) None of the officers attempted to

---

[7] "Tr." refers to the transcript prepared by transcriber Johanna Masse of the officers' cruiser video recording of the events on May 29, 2010.

speak with Mr. McKaig before entering Plaintiff's residence. They provided varying accounts regarding whether they heard him advise them of Plaintiff's prior medical event.

The officers entered Plaintiff's residence with their guns drawn at a low ready position. On the second floor, it was smoky, fire alarms were going off, there was a pan with burned food in the kitchen, and the kitchen faucet was running. (Doc. 84 at 9, ¶¶ 60, 62.) One officer removed the pan from the stove. There were "no threats visible on the second floor," (Doc. 98-33 at 3), "no visible fire," (Doc. 84 at 9, ¶¶ 63, 65), and nothing was "actively burning." (Doc. 98-3 at 9-11, ¶¶ 60, 63, 65.) Officer Adams believed the second floor looked "messy," but not ransacked, and that the mess she observed was common and not out of the ordinary for a residence. (Doc. 84-8 at 11, Adams Dep. at 26:3-15.)

The officers proceeded to the third floor of Plaintiff's residence, which was also smoky. Officer Peyton believed the smoke was coming from another room because he did not see anything on fire or smoldering in the master bedroom, which was Plaintiff's bedroom. Officer Peyton described the master bedroom as "a little messy" with some clothes on the floor and an unmade bed. (Doc. 98-13 at 13, Peyton Dep. at 46:1-17; *accord* Doc. 98-33 at 4.) In contrast, Officer Adams described Plaintiff's bedroom as "a very messy room, clothes just thrown everywhere, garbage everywhere, drawers pulled open," with "stuff" that was "hanging out of drawers[.]" (Doc. 84-8 at 12-13, Adams Dep. at 27:22-28:3.) Officers Adams did not observe a fire in Plaintiff's bedroom and could not locate "the source of smoke." (Doc. 84-8 at 13, Adams Dep. at 28:4-8.)

Sergeant Moody entered another bedroom on the third floor which was Plaintiff's daughter's room. Sergeant Moody described this room as "messy and in disarray" with "things on the floor and clothing on the floor" like "somebody had gone through things." (Doc. 84-3 at 14, Moody Dep. at 36:3-21.) In deposition, he agreed that the room's appearance would not be unusual for a child's bedroom if the officers had known that at the time. Apart from the "disarray" on the second and third floors, the officers did not observe any weapons or drugs, any tools associated with burglary, or other evidence consistent with a burglary, such as belongings collected and prepared to be removed from

the residence. (Doc. 98-11 at 13, Moody Dep. at 34:6-23; *accord* Doc. 98-13 at 14-15, Peyton Dep. at 47:17-48:8.)

Officer Peyton approached Plaintiff's third floor bathroom, where the officers had been told the man was located. They observed a naked African-American male, later identified as Plaintiff, sitting on the toilet. (Doc. 98-3 at 12, ¶¶ 67-68.) Officer Peyton noted that Plaintiff was "profusely sweating" and had a "thousand yard stare looking at [Officer Peyton], kind of like looking through [him]." (Doc. 84-5 at 23, Peyton Dep. at 49:15-20.) Officer Peyton further described Plaintiff's eyes as rolling in the back of his head. Based on Plaintiff's physical appearance, Officer Peyton believed he may have been in a "drug-induced state" at that time. (Doc. 84-5 at 24, Peyton Dep. at 50:8-11.) Officer Peyton immediately yelled: "Throw your f***king hand[s] up or I'll shoot you, mother f***er. Put your hands up now. About to burn. Show me your f***ing hands." (Tr. at 5:18-21.)

When Officer Adams heard Officer Peyton's command, she left the master bedroom and entered the doorway to the third floor bathroom with her weapon drawn. She observed Plaintiff sitting on the toilet, sweating profusely, with his eyes open and looking at the officers but "staring straight at" and "[r]ight through" them. (Doc. 84-8 at 15, Adams Dep. at 30:2-3, 18-21.) She believed based on Plaintiff's physical appearance that Plaintiff was "on drugs and he's either suicidal and about to shoot himself or something really bad is about to happen." (Doc. 84-8 at 15, Adams Dep. at 30:4-7.)

The officers then issued a series of commands to Plaintiff:

**Officer Adams:**   Get your hands up.

**Officer Peyton:**   Get your hands up.

**Officer Adams:**   Put your hands up.

**Officer Peyton:**   Keep them up. Keep them up.

**Officer Adams:**   Put your hands up.

**Officer Peyton:**   Hands up. Keep your hands up.

11

| **Officer Adams:** | Put your hands up. Come on, man. Put them up. |
| **Officer Peyton:** | Put your hands up. Put your hands up. |
| **Officer Adams:** | Put your hands up. You're going to get shot. Put them up. |
| **Officer Peyton:** | Put your hands up. Put your f***ing hands up now. |

(Tr. at 5:22-6:11.)

Because Plaintiff did not respond to the officers' repeated commands even though he was looking "right" at the officers, Officer Adams assumed he did not "belong" at the residence and was "deliberately disobeying," but she did not consider that Plaintiff may be sick. (Doc. 84-8 at 15-16, 20, Adams Dep. at 30:12-21, 34:19, 38:1-7.) Officer Peyton also did not consider that Plaintiff could be sick and that Plaintiff might be incapable of complying with their commands. (Doc. 84-5 at 25, 40-41, Peyton Dep. at 51:1-5, 74:21-75:4.) Officer Peyton, however, did not believe that Plaintiff was "deliberately disobeying" the officers' commands because he assumed Plaintiff was on drugs. (Doc. 84-5 at 31, Peyton Dep. at 62:1-6.)

The officers did not ask Plaintiff, who was non-communicative, to identify himself. Officer Adams assumed "that if he lives in the residence . . . that he would say[,] hey, this is my house." (Doc. 84-8 at 17, Adams Dep. at 35:3-7; *see also* Doc. 84-5 at 27, Peyton Dep. at 55:18-21.) Officers Adams and Peyton agree that, at this point, Plaintiff was not violent towards them "in any way[.]" (*See, e.g.*, Doc. 84-5 at 27, Peyton Dep. at 55:9-14.) Officer Adams also believed that Plaintiff had not threatened her, although she stated that she felt threatened by his non-compliance with their repeated commands. (Doc. 84-8 at 19, Adams Dep. at 37:1-14.)

Sergeant Moody then arrived at the doorway to the bathroom and likewise observed Plaintiff sitting naked on the toilet with a "look that looked right through you." (Doc. 84-3 at 16-17, Moody Dep. at 41:21-42:5.) He described Plaintiff's body as coated with a "sheen like it was sweaty or wet." (Doc. 84-3 at 16, Moody Dep. at 41:22-23.)

Sergeant Moody did not see Plaintiff "make any effort" to attack the officers, flee, or evade arrest, and Plaintiff was not violent towards them "in any way." (Doc. 84-3 at 17, 26, Moody Dep. at 42:13-18, 60:7-61:13.)  Sergeant Moody nonetheless believed Plaintiff was acting in a "passive aggressive" manner because Plaintiff was not following their verbal commands. (Doc. 84-3 at 17, 26, Moody Dep. at 42:13-18, 60:7-61:13.)  It did not "occur" to Sergeant Moody that Plaintiff might have been sick, but he did consider that Plaintiff "may have been under the influence of some illegal narcotic." (Doc. 84-3 at 17, Moody Dep. at 42:21-23.)  All three Hartford officers surmised Plaintiff was under the influence of drugs based solely on his physical appearance.

Because he was unable to call out from inside Plaintiff's residence, Sergeant Moody left to contact the Hartford Fire Department and to request an ambulance for Plaintiff since Sergeant Moody believed Plaintiff was "under the influence of some type of drug." (Doc. 84-3 at 19, Moody Dep. at 47:9-15.)  While Sergeant Moody was outside Plaintiff's residence he discovered that "a black male lived in the condominium and had medical issues." (Doc. 84 at 17, ¶ 128.)  Sergeant Moody did not immediately relay this information to his fellow officers who were confronting Plaintiff inside his home at gunpoint.

While Sergeant Moody was outside, Officers Adams and Peyton remained upstairs with Plaintiff in the third floor bathroom.  When Plaintiff remained non-responsive to their commands, Officer Peyton sprayed Plaintiff twice in the face with oleoresin capsicum ("OC") spray, commonly known as pepper spray.[8]  The officers were in Plaintiff's residence for approximately three minutes before encountering him and approximately one minute elapsed between their locating Plaintiff and their use of pepper spray.

After the two applications of pepper spray, Plaintiff started coughing, stood up, stumbled backwards, and fell onto the rim of the bathtub or into it.  Plaintiff then again

---

[8] Officer Peyton explained that OC spray contains a derivative of a pepper as well as an accelerant and that it is used to help subdue an individual by causing the individual's mucous membranes to drain and eyes to water and "temporarily" causes a loss of "focus," although it does not cause blindness or unconsciousness. (Doc. 84-5 at 35-36, Peyton Dep. at 67:18-68:10.)

stood up. The officers, who were standing in the doorway, ordered Plaintiff, approximately eighteen times, to "[g]et on your stomach," to "[d]o it now," and to "[b]ack up." (Tr. at 8:3-9:3.) Officer Peyton also stated: "We'll take care of you." (Tr. at 8:9.)

Because Plaintiff had not obeyed their commands and was instead "walking towards" them, the officers assumed that Plaintiff was going to attack them. (Doc. 84-5 at 45, Peyton Dep. at 80:5-22.) At this point, Plaintiff had made no overt violent gestures. In deposition, Officer Peyton acknowledged that Plaintiff had not threatened him "in any way." (Doc. 84-5 at 46-47, Peyton Dep. at 81:15-82:1.) The officers were aware that Plaintiff had no weapons in his hands or on his person. As Plaintiff approached them, the officers decided that they needed "to go hands on, get control of the [P]laintiff, detain him and then -- once it was safe -- move forward." (Doc. 84 at 14, ¶ 103.)

Officer Peyton reached for Plaintiff's right arm, and Officer Adams reached for Plaintiff's left arm. They again issued a series of commands to Plaintiff:

| **Officer Peyton:** | [Unclear] now. Get your hands behind your f***ing back. |
| **Officer Adams:** | [Unclear]. Get the [unclear]. |
| **Officer Peyton:** | Put your hands behind your back. Do it now. |
| **Officer Adams:** | Get the other arm behind his back. |
| **Officer Peyton:** | Get your arm behind your back. |
| **Officer Adams:** | Get it behind your back. |
| . . . | |
| **Officer Peyton:** | Put your hands behind your back. . . . Come on. Now give me the other one. |

(Tr. at 9:4-9:13.)

After Officer Adams secured one handcuff to Plaintiff's left wrist, the officers believed that Plaintiff resisted being handcuffed. This led to a physical altercation

14

between the officers and Plaintiff which is the subject of varying accounts. The officers agree that Plaintiff either pushed or pulled away from them, prompting Officer Adams to fall to the floor with Plaintiff either standing over her, straddling her, or on top of her. The officers testified that they were concerned that Plaintiff could reach for Officer Adams's firearm or use the handcuffs she no longer controlled as a weapon. Officer Adams believed Plaintiff was "going" for her hands and "grabbing" at them. (Doc. 84-8 at 26-27, Adams Dep. at 45:18-46:11.) Officer Peyton did not observe Plaintiff trying to punch, strangle, or fight Officer Adams. (Doc. 98-13 at 30, Peyton Dep. at 85:9-22.) Plaintiff did not try to punch or strike Officer Peyton, although he grabbed for him once, which prompted Officer Peyton to strike Plaintiff's left arm with his baton.

As the officers repeatedly ordered Plaintiff to put his arms or arm behind his back, Officer Peyton used his baton to strike Plaintiff's left thigh area five to seven times and his left bicep area at least once. (Doc. 84 at 16, ¶¶ 121-23.) After being struck with the baton, Plaintiff went to the ground facedown, lying on his stomach. Officer Peyton kneeled to grab Plaintiff's arms to finish handcuffing him, but the officers claim that they were unable to restrain Plaintiff. Officers Peyton and Adams yelled for Sergeant Moody to help them, and they stated they could not breathe due to the discharge of OC spray.

In response, Sergeant Moody returned to the third floor of Plaintiff's residence. There, he assisted the other officers in restraining Plaintiff's arms behind his back and handcuffing him using two sets of handcuffs. Officer Adams then asked where Plaintiff lived, and Sergeant Moody replied, "[h]ere, apparently."[9] (Tr. at 10:13-14.) Officer Adams stated, "Here? . . . Are you serious?" (Tr. at 10:17.) At that point, Officer Adams believed it was imperative to quickly remove Plaintiff from his residence because of their use of OC spray and because it remained smoky upstairs. She stated: "We've got to get him out of here. Let's just get him out of here quick. We've got to get him out.

---

[9] The audio recording from Officer Adams's body microphone and the video recording from the cruiser are not in sync. For example, the video recording shows Sergeant Moody still outside Plaintiff's residence when the audio recording provides this conversation between Officer Adams and Sergeant Moody that occurred inside Plaintiff's residence.

Let's just get him downstairs, at least." (Tr. at 10:24-11:2.) Both Officers Adams and Peyton reiterated that they could not breathe inside the residence.

Plaintiff remained in handcuffs, and one of the officers wrapped Plaintiff, who was naked throughout the encounter, in a blanket. Officer Adams told Plaintiff: "Let's go get you hosed down, all right? Ready to go? Ready to go get hosed down? . . . Help us walk, okay? Come on. We'll get you hosed down. . . . It will be okay in about two seconds." (Tr. at 11:20-12-3.) At this point, Plaintiff responded verbally for the first time: "What do you want me to do?" (Tr. at 12:9.) Officer Adams advised Plaintiff to "keep going" outside where they would "get [him] hosed down," and Officer Peyton told Plaintiff, "Let's go. Let's go. Let's go." (Tr. at 12:10-14.) Plaintiff responded, "I'm going." (Tr. at 12:15.) Officer Adams and Sergeant Moody walked Plaintiff outside. Officer Peyton located a hose from a next-door neighbor who was outside at that time and used the hose to decontaminate Plaintiff and wash his eyes out. At the time, Plaintiff was "bleeding all over his wrist." (Tr. at 29:12-13.)

Plaintiff's neighbor, Mr. McKaig, approached Plaintiff and attempted to speak with him. He told the officers that he was Plaintiff's neighbor and a retired police lieutenant who had been "[doing] this for 30 years." (Tr. at 12:23-14:19.) Officer Adams repeatedly told Mr. McKaig to "back down" and "[b]ack off," and when he responded, "[d]on't talk to me that way," she threatened to arrest him. (Tr. at 12:23-14:19.)

Thereafter, Officer Peyton asked Plaintiff why he did not respond to the officers, and Plaintiff replied: "I don't know." (Tr. at 14:23-25.) When asked, Plaintiff denied taking any drugs. Officer Peyton commented to Plaintiff: "You seem like you're way out of it." (Tr. at 15:4-5.) Officer Peyton acknowledges that, at some point in the encounter, he understood that EMTs had previously responded to Plaintiff's residence as the result of Plaintiff's medical condition.

Officers Adams and Peyton spoke with an unidentified officer who asked what happened, and Officer Adams responded that they "just got in a fight in the house." (Tr.

at 15:23-24.)[10] After the unidentified officer asked whether they were "[f]ighting with him," Officer Peyton responded that he "[p]epper sprayed [Plaintiff] and hit him quite a few times" because he would not "submit." (Tr. at 15:25, 16:3-7.) Officer Adams asked whether Plaintiff lived there, and after the unidentified officer responded, "[y]es," she questioned: "What the f**k was his issue? Why didn't he just put his f***ing hands up." (Tr. at 16:10-14.) Officer Peyton stated: "That's what I just asked him. He said he don't know." (Tr. at 16:15-16.) Officer Adams also questioned what was on fire and why "the f**k [was] there so much smoke" inside Plaintiff's residence. (Tr. at 16:20-21.) The unidentified officer replied that "something was burning inside." (Tr. at 18:17.) Officer Adams then commented, "He's -- he's messed up on something. I don't know. He's [skip in recording], though, so it's all over him, you know." (Tr. at 17:19-21.)

Speaking with Sergeant Moody on the scene, Officer Adams explained that they "were all over that f***ing room," while Officer Peyton stated: "We were arresting this guy and we're doing out damnedest and he's a big dude. . . .[11] He was -- we were jumping [unclear] a big guy." (Tr. at 19:7-18.) They also discussed Plaintiff's identity after an EMT on the scene told them he had "transported this guy before" due to a "diabetic problem." (Tr. at 20:21-22:9.) Officer Adams questioned: "Why did people say they don't f***ing know him is my question? [Sergeant] Moody, why the f**k did they say they didn't know him?" (Tr. at 20:21-22:9.) The officers then discussed that the bystanders were the cleaning crew, that they had called 911, and that they did not know Plaintiff or that it was Plaintiff's residence they were cleaning.

At this point, there were additional Hartford officers on the scene, some of whom again spoke to Ms. Thomas, Ms. Dean, and the unidentified male. As Ms. Thomas started crying and explaining she had "never seen [Plaintiff] before," Officer Adams replied, "[t]hat's okay. Don't worry about it. Something's wrong with him right now. He needs to go to the hospital." (Tr. at 20:21-22:9.) Officer Adams also told Ms.

---

[10] During the course of the incident, the officer from the Norwich Police Department advised dispatch of a "10-10," indicating a fight, "on scene . . . with the male subject." (Doc. 98-17.)

[11] The Hartford Fire Department report from the incident lists Plaintiff's weight at 175 pounds.

Thomas that she should not "feel bad about calling" because Plaintiff "obviously need[ed] medical attention," he was not "okay," and he "freaked out because he doesn't know what's going on." (Tr. at 23:20-25, 24:20, 36:24-25, 24:2-3.) She later told Ms. Thomas that Plaintiff was going to be transported to the hospital because he was "having a diabetic coma or something." (Tr. at 24:18-20.)[12]

Officer Adams and an unidentified officer commended the housekeepers for calling 911, which they said "[p]robably saved" Plaintiff's life. (Tr. at 38:3.) Officer Peyton, however, confronted Ms. Thomas and Ms. Dean because he was "upset with the cleaning crew" and he instructed Ms. Dean "that she should make it a point [for] all the employees [to] meet all [her] clients please [so] situations like this wouldn't happen[.]" (Doc. 98-33 at 12.) Ms. Thomas described being "reprimand[ed]" at the scene after the incident, which made her "feel like a piece of crap" and that she was "getting the raw end of the deal," and she felt as though she was being blamed for "some of what happened[.]" (Doc. 98-9 at 4-5, Second Thomas Dep. at 16:16-17:23.)[13]

Officers Adams, Peyton, and an unidentified officer then discussed what occurred inside Plaintiff's residence. During this conversation, Officer Adams stated that they

---

[12] During this conversation with Ms. Thomas, Ms. Thomas confirmed her report to the Dispatcher that she had seen a lamp and an alarm clock tipped over when she entered the master bedroom that she picked up and that she poured water on the area that was smoldering to stop the smoking and burning, which it did. The officers also obtained a signed statement from Ms. Thomas that the residence looked "ransacked" when she entered, that she observed an "overturned lamp" and it was "smoky" inside, and that she saw a male in the bathroom who "took [her] by surprise." (Tr. at 37:2-18.)

[13] Ms. Thomas subsequently testified that Ms. Dean told her after the incident that it was "important" to "cooperate" with the Hartford Police Department. (Doc. 98-9 at 9, Second Thomas Dep. at 27:6-9.) In January of 2014, regarding an unrelated incident with Ms. Dean and another individual, Ms. Dean told Sergeant Moody that she wanted Sergeant Moody to assist her in evicting the individual from her residence and, when he said he could not, she complained that she had been "sticking up for you guys" in this "Wayne-thing." (Ex. 28 at 04:25-04:57.) She further stated she was "doing the right thing by you guys" and noted the sheriff had been looking for her. Sergeant Moody responded that his refusal to help her with that incident had "nothing to do with the Wayne-thing" and that he did not expect her to lie under oath. (Ex. 28 at 04:30-04:48.)

"were fighting" and that Plaintiff was "all f***ed up" and did not "even know what he was doing." (Tr. at 31:22, 32:20-22.) The officers further discussed:

| | |
|---|---|
| **Officer Peyton:** | That was a pretty good fight we had doing there. |
| **Officer Adams:** | I know. [Unclear]. |
| **Officer Peyton:** | I feel bad for the guy that f***ing lives there, you know? |
| **Officer Adams:** | Uh-huh. He didn't put his hands up and he -- he just -- that's too scary for me to deal with. |
| **Officer Peyton:** | Yeah. |
| **Officer Adams:** | Yeah. I'm not going to walk on glass for him. |
| **Officer Peyton:** | Holy sh*t. No. I don't know who this guy is. There's no family pictures downstairs that -- |
| **Unknown Officer:** | As soon as I saw him, I recognized him. He works out at the gym. He's a trainer at the gym I go to. |
| **Officer Peyton:** | F***ing -- I'm on fire, man. |
| **Officer Adams:** | Yeah. He's definitely -- |
| **Unknown Officer:** | [Unclear] watching him good. |
| **Officer Peyton:** | I'm sitting there, man, I'm putting myself away [phonetic], because he wasn't changing. |
| **Unknown Officer:** | [Unclear] idea of breaking the [unclear]? |
| **Officer Peyton:** | He did break [unclear]. |

(Tr. at 33:8-34:9.) After Officers Adams and Peyton noted that the OC spray was "burning [them] bad," (Tr. at 34:19), the conversation between the officers continued:

| | |
|---|---|
| **Officer Peyton:** | Is he bleeding at all? |
| **Unknown Officer:** | Yeah, he is pretty [unclear]. |

| | |
|---|---|
| **Officer Adams:** | We couldn't get the f***ing cuffs on him. |
| **Officer Peyton:** | We did.  And then he was on top of you for a second and I'm like, f**k that. |
| **Officer Adams:** | [Unclear].  I had to pull him down, but he was f***ing strong. |
| **Officer Peyton:** | He was strong.  We had to pin him down.  Damn it.  My mic might still be on.  Sh*t.  [Unclear] like, What are you going in with guns for?  I'm like, Shut up. |
| **Officer Adams:** | Oh my god.  I was getting pissed at people.  F**k off. |
| **Officer Peyton:** | Yeah. |
| **Officer Adams:** | I told that guy, You need to f***ing leave or I'm going to arrest you, because he's all like [unclear] he's a nice guy, he lives here, blah.  I'm just like, You need to f***ing go away. |
| **Officer Peyton:** | If this guy [unclear] sh*t, I'm going to feel bad. |
| **Officer Adams:** | Our lives are more important.  He's over there saying I'm sorry, I'm sorry. |
| **Officer Peyton:** | He's coming out of it. |

(Tr. at 35:11-36:11.)

Officers Adams and Peyton then spoke with Plaintiff who was sitting or lying on the sidewalk, unrestrained and rubbing his eyes.  Officer Peyton told Plaintiff: "You got in -- you got in a fight with us.  Do you remember that?  Do you remember getting in a fight with us? . . . [Y]ou got in a pretty good tussle with her."  (Tr. 42 at 7-12.)  Plaintiff apologized to Officer Adams, but stated he had no recollection of what had transpired inside.

Two EMTs, Mr. Robishaw and Norman Mariotti, treated Plaintiff, whose blood sugar level was in the twenties when they first measured it and rose to 41 after Plaintiff received glucose.  Hartford Fire Department records note that Plaintiff was "very

confused" and had no recollection of the "events" that had just occurred. (Docs. 98-18 & 98-37 at 1.) After their initial treatment, one EMT advised Plaintiff that they were going to transport Plaintiff to the hospital since he was "shivering," had been sprayed with OC spray, and still had a low blood sugar reading. (Tr. at 42:3-6.)

At some point, the two other officers on the scene, Officers Rogers and Brunelle, removed Plaintiff's handcuffs. (Doc. 98-17.) Someone located clothes for Plaintiff, and he was transported to the hospital, where his blood sugar was recorded at 133 upon arrival. Plaintiff was reported to be "cooperative." (Doc. 98-20 at 5.) At the hospital, glucose was administered to Plaintiff, his eyes were flushed out with saline, and the laceration on his wrist received stitches. Plaintiff now has a scar on his wrist. Plaintiff suffered no fractures or bruising, but had some swelling and significant pain in his legs and back. Plaintiff's treatment records reflect a diagnosis of an "acute hypoglycemic episode," (Doc. 98-20 at 3), and the doctor who treated Plaintiff diagnosed insulimona as the "cause" of "the hypoglycemic events" of May 29, 2010. (Doc. 98-4 at 2; Lantner Dep. at 81:9-14.)

Plaintiff has no memory of the incident from the time he returned home the previous evening until he "came to" the next day outside his residence, sitting on the sidewalk "getting [his] eyes washed out by a hose." (Doc. 98-21 at 3-5, Burwell Dep. at 37:23-38:5, 42:16-21.)[14] He specifically has no memory of hearing a fire alarm or the officers' commands, and he has no memory of the OC spray or the baton strikes. Plaintiff has had several "hypoglycemic events" preceding May 29, 2010, during which he generally lost consciousness and had no memory of what occurred during that time. (Doc. 84-11 at 13-14, Burwell Dep. at 83:6-84:6.)

### D.    Investigations of the Incident.

Chief Cutting[15] was not working on the date of the incident, and he was not informed of it while it was transpiring. On May 31, 2010, he and his deputy chief met

---

[14] Plaintiff believes he was in handcuffs on the sidewalk when he "came to" but the video recording reveals he was not.

[15] Chief Cutting had been the Hartford Police Chief since October of 2006.

with Plaintiff at his residence.  Plaintiff advised them that he had no memory of the
incident.  Chief Cutting ordered an internal investigation, which Hartford's lead
detective, Michael Tkac, was assigned to conduct.  Detective Tkac's investigation
focused on whether there had been any violations of Department policies on the Use of
Force or Rules of Conduct, and he concluded the officers did not violate the Use of Force
policy, but did violate the Rules of Conduct policy for their use of profanity.

Following the internal investigation, Chief Cutting "concluded that the force used
by the officers was consistent with their training and did not violate [the Department's]
use-of-force policy" but "that some of the language used by Officers Peyton and Adams
was inappropriate and violated policy."  (Doc. 84 at 21, ¶¶ 163-64.)  Chief Cutting met
with each of the three officers separately for a one-on-one critique.

Chief Cutting also asked the Vermont State Police ("VSP") to conduct an
investigation of the incident.  VSP Lieutenant Michael Henry (then a Detective Sergeant)
was assigned to conduct the VSP investigation, and he prepared a "summary report" of
the incident.  (Doc. 98-40.)  It was his understanding he was "investigating whether the
officers had acted properly or improperly" and whether they committed a crime in
responding to this incident, although his summary report offers no conclusions in this
regard.  (Doc. 84-10 at 6, Henry Dep. at 10:7-16.)  The Office of the Attorney General
reviewed the VSP investigation and concluded that the officers "had not engaged in any
criminal misconduct."  (Doc. 84 at 21, ¶ 161; Doc. 98-3 at 29, ¶ 161.)

### E.    Hartford Police Department Policies.

At the time of the incident, the Hartford Police Department had policies regarding
the use of deadly and non-deadly force which required evaluation of: the severity of the
crime at issue; whether the suspect posed an immediate threat to the safety of the officer
or others; whether the suspect was actively resisting arrest or attempting to evade arrest
by flight; whether the circumstances were tense, uncertain, and rapidly evolving; and
whether the officer's actions were "objectively reasonable" in light of the circumstances
confronting them, without regard to underlying intent or motivation.  *Id.* at 24, ¶¶ 180-82.

The Hartford Police Department's policy on the use of non-deadly force provides that pepper spray is "intended primarily for use by a police officer to subdue an attacker or violent suspect" and that officers "will employ [pepper spray] in the manner that they were instructed and certified." *Id.* at 24-25, ¶ 184. The policy further provides that pepper spray "shall not be used on a person in confinement except under extreme circumstances that pose a hazard to the suspect and or the officer, *i.e.*, a handcuffed suspect in the booking room who is trying to injure himself/herself or who poses a threat to the officer's safety who is rendering aid to the suspect." (Doc. 84 at 25, ¶ 189.)

### F.    Prior and Subsequent Incidents of Pepper Spray and Excessive Force.

In the four years preceding the incident in question, there was one prior instance during which Hartford officers used pepper spray. In that instance, after a suspect had taken a child into a room, the officers, who were concerned for the child's safety, sprayed the suspect through a crack in the door rather than force their way into the room.

In the four years preceding the incident in question there were also two complaints that the Hartford Police Department used excessive force. In the first incident, the complaint was made to the VSP but never to the Hartford Police Department, and after the complainant refused to cooperate with the investigation, the investigation ceased. In the second incident, a Hartford police officer was accused of using excessive force on a complainant while other officers were arresting the complainant's husband for domestic violence but "the charge was deemed to be unfounded" after an internal Hartford Police Department investigation. (Doc. 84 at 27, ¶ 202.) In those same four years, two lawsuits were filed against either the Hartford Police Department or its officers, but neither lawsuit involved allegations of excessive force. During this same time frame, one Hartford police officer was investigated by the VSP in connection with an allegation of an off-duty domestic assault, but no criminal charges were filed.

Following the incident in question, there were two incidents involving the alleged use of excessive force by Hartford police officers: a September 2010 incident during which Hartford police officers responding to a domestic abuse call had physical contact with the complainant and the complainant suffered a head laceration; and a June 2011

incident during which Hartford police officers entered a man's home, removed him from his home, and forcibly handcuffed him in his driveway after a report of a minor traffic accident.

### G.    The Disputed Facts.

It is disputed who initially labeled the 911 call "a burglary."[16] The Dispatcher stated that she never labeled the call a burglary or burglary in progress, but instead labeled the call as "suspicious." (Doc. 84-1 at 17, 21, Leinoff Dep. at 32:18-20, 45:10-13.) The call detail report and incident table both indicate the call was labeled as "suspicious" and involving a "[s]uspicious [p]erson/[c]ircumstance." (Doc. 98-26 at 3; Doc. 98-27 at 1.) Sergeant Moody recalled that the Dispatcher reported to him that "there may have been a burglary in progress." (Doc. 84-3 at 4, Moody Dep. at 7:8-11.)

The Dispatcher was also unclear whether she reported to Sergeant Moody that the caller had identified the man inside the residence as a "black" male, although she was clear that she had reported that the man was "unclothed or naked." (Doc. 98-10 at 8-10, Leinoff Dep. at 30:11-31:7; 36:20-25.) While she stated she had this information before dispatching the officers, she also stated she could not recall being told the unidentified man was black. The call detail report indicates that the cleaners saw a "black male sitting on the toilet." (Doc. 98-26 at 2.)

Once the officers were on the scene of the incident, the officers claim that they did not speak with Ms. Dean; however, the video recording depicts Ms. Dean approaching a cruiser and speaking to its operator. There is no recording of the conversation. Sergeant Moody described during his interview with VSP Officer Henry that he saw Officer Peyton speaking "with two women" when he arrived on the scene. (Doc. 98-15 at 3.)

As Officer Adams approached Plaintiff's condominium complex, she testified that she heard individuals "screaming" that there was an "intruder" upstairs in the residence

---

[16] While it is unclear whether Ms. Fortune or Ms. Thomas called 911 initially, as Ms. Fortune stated she made the call and spoke with an operator for approximately half of the call, any dispute in this respect is not material.

who did not "seem" to belong there and that they were scared.  (Doc. 84-8 at 9, Adams Dep. at 24:3-10.)  The audio recording does not reflect anyone on the scene screaming.

It is unclear whether Ms. Dean or Ms. Thomas asked why the officers had drawn their firearms prior to entering the residence.  While Officer Adams concedes she heard the question, it is disputed whether Officer Peyton also heard this question.  Officer Peyton maintains that he did not hear the question, (Doc. 84-5 at 16, Peyton Dep. at 35:5-8), but the recording clearly captures him responding to the question: "It's just that I don't know who the hell this guy is. . . .  I don't know this guy."  (Ex. 5 at 01:55-02:02; Tr. at 3:6-9.)  Moreover, while the officers were still on the scene following the incident inside the residence, Officer Peyton stated to Officer Adams that the individuals outside were "like, What are you going in with guns for?  I'm like, Shut up."  (Tr. at 35:11-36:11.)

It is also unclear the extent to which the officers heard Mr. McKaig's comments about Plaintiff's medical condition before entering Plaintiff's residence.  The officers claim that they could not hear Mr. McKaig over the sounds of the fire alarm.  (Doc. 84 at 9, ¶ 59; *see also* Doc. 84-3 at 8, Moody Dep. at 28:1-10; Doc. 84-5 at 18, Peyton Dep. at 38:9-15.)  The recording, however, indicates that Mr. McKaig spoke to the officers before the fire alarm can be heard on the recording.  As Mr. McKaig stated that Plaintiff had been found unconscious upstairs a couple weeks prior, Officer Adams looked directly at Mr. McKaig.  She subsequently testified that the officers were focused on securing the residence, "not somebody yapping on the side."  (Doc. 84-8 at 8, Adams Dep. at 21:12-16.)

When the officers entered Plaintiff's third floor bathroom and encountered him sitting naked on the toilet, it is disputed whether the officers could determine whether Plaintiff was armed and whether Officer Peyton's first command to Plaintiff ordered him to show his hand or to show his hands when he stated "Throw your f***king hand[s] up or I'll shoot you, mother f***er."  (Tr. at 5:18-21.)  The officers nonetheless all maintain that they could not see both of Plaintiff's hands.  They provide varying descriptions of how Plaintiff attempted to conceal his hands which is at odds with their further claim that

Plaintiff was non-responsive and in what appeared to be a drug-induced stupor.  Officer Adams stated in her VSP interview that Plaintiff had one of his hands at his side and the other hand was "hidden by his other leg," and he "kept dropping his hand down[.]"  (Doc. 98-16 at 5-6.)  Other officers reported seeing Plaintiff attempting to conceal his hands between the toilet and the vanity.[17]  The officers contend that, because they could not see Plaintiff's hands, Plaintiff posed a threat to their safety and could have reached for weapon located near the toilet.

While Officer Peyton asserts that he could not see Plaintiff's hands, he also explained that he did not have his finger on the trigger of his weapon because he did not "see a threat at that point" and because there was "nothing in his hands."  (Doc. 98-13 at 21; Peyton Dep. at 59:7-15.)  He told VSP Officer Henry that "at that point in time when [he] did use the OC spray," he "didn't think [Plaintiff] had access to a weapon or anything[.]"  (Doc. 98-33 at 9.)  He conceded that Plaintiff's hands were visible when he "hit him with the OC" because Plaintiff's hands went to his "chest area."  *Id.* at 8.  It is not clear whether Officer Peyton referred to the first or second application of OC spray.[18]  Officer Adams described that between the applications of OC spray, Plaintiff was "laying against the back of the toilet and his hand [was] down at his left side."  (Doc. 98-16 at 6-7.)

After Officer Peyton sprayed Plaintiff twice in the face with OC spray, the officers offer conflicting accounts regarding whether Plaintiff was rubbing or wiping his eyes and whether Plaintiff could see the officers.[19]  Officer Peyton explained that OC spray

---

[17] Sergeant Moody described Plaintiff as "sticking his hands down behind the vanity[.]"  (Doc. 98-15 at 5.)  Officer Peyton told VSP that Plaintiff as "lowering his hands" between the toilet and the vanity, (Doc. 98-33 at 7), and he told Detective Tkac that Plaintiff "kept moving his hands into a vanity area[.]"  (Doc. 98-29 at 1.)

[18] Officer Peyton also offered conflicting accounts regarding whether he held his firearm while discharging the OC spray and then holstered his firearm once Plaintiff stood (*see* Doc. 84-5 at 42, Peyton Dep. at 76:4-5), or whether he holstered his firearm prior to discharging the pepper spray because Officer Adams had him covered (*see* Doc. 98-33 at 8).

[19] In their memorandum of law in support of their motion for summary judgment, Defendants cite *Broadhurst v. Cty. of Rockland*, 2011 WL 5142760, at *3 (S.D.N.Y. Oct. 31, 2011), for the

"temporarily" causes a loss of focus (Doc. 84-5 at 35-36, Peyton Dep. at 67:18-68:10), while Sergeant Moody noted that Plaintiff "obviously" could not see because of the OC spray and that the officers therefore had to assist Plaintiff in walking outside or Plaintiff would have fallen down the stairs. (Doc. 98-15 at 9.) Once the officers and EMTs tried to administer aid to Plaintiff, they noted that Plaintiff was unable to keep his eyes open due to the OC spray.

It is unclear how Sergeant Moody learned of Plaintiff's medical condition when he left the bathroom to radio for the Hartford Fire Department and an ambulance. While Sergeant Moody stated that he "overheard somebody say that [Plaintiff] had a medical condition and that he was taken to the hospital a short time before that" (Doc. 84-3 at 28, Moody Dep. at 66:3-8), he told VSP Officer Henry that he spoke with Ms. Dean at his cruiser and that she said Plaintiff had "some type of medical condition." (Doc. 98-15 at 6.) The video recording also appears to depict Sergeant Moody speaking with Mr. McKaig outside the residence during this same time period.

There is a dispute regarding what transpired during the physical altercation between Plaintiff and the officers inside Plaintiff's residence. As there is no video recording of what transpired, and Plaintiff has no recollection of the events, the officers' credibility on this point is dispositive. Officer Adams claims that Plaintiff was "on top" of her and she had to "struggle[e] to get out from underneath him[.]" (Doc. 98-16 at 7-8.) She stated they were all on the floor at that point. Officer Adams explained that, while Plaintiff was on the ground, he still had "super, super strength" and that she could not force Plaintiff's arms behind his back because "he was fighting with all his might to prevent that." (Doc. 84-8 at 25, 29, Adams Dep. at 44:12-21.)

In contrast, Officer Peyton recalled that Officer Adams fell to the ground "in a hunched position" with Plaintiff over her and with him on top of Plaintiff. (Doc. 98-33 at 10.) During his deposition, he further stated that Plaintiff fell to the ground on top of Officer Adams, but later clarified that Plaintiff was not lying on top of Officer Adams but

---

proposition that "ordinary and expected effects of pepper spray" include "pain to [the suspect's] face and irritation to, and the inability to open [his or] her eyes." (Doc. 83 at 12.)

was standing over her. (Doc. 98-13 at 31-32, Peyton Dep. at 86:6-87:22.) When asked whether he saw Plaintiff fighting with Officer Adams, Officer Peyton explained that he did not see Plaintiff fighting her and that he just saw that Plaintiff "ended up on top of her[.]" (Doc. 84-5 at 49-50, Peyton Dep. at 85:9-86:2.) Immediately after the incident, while still on the scene, Officer Peyton remarked to Officer Adams that Plaintiff "was on top of [her] for a second and I'm like, f**k that." (Tr. at 35:11-36:11.)

After delivering baton strikes to Plaintiff's body, Officer Peyton testified that Plaintiff "collapsed onto the ground" facedown and "just ran out of gas" (Doc. 98-33 at 10) and that "all the energy had just left his body[.]" (Doc. 84-5 at 52-53, Peyton Dep. at 88:21-89:8.) Sergeant Moody noted that the officers had Plaintiff's arms behind his back when he returned to the bathroom and that he did not have to assist the officers in gaining control of Plaintiff's arms. He explained that he only assisted to "direct[]" the closing of the handcuffs because the officers could not see or were trying to close the handcuffs too fast. (Doc. 98-15 at 7.)

It is disputed whether Plaintiff was capable of physically complying with the officers' commands and of fighting with them. An EMT advised Officer Adams that Plaintiff's blood sugar level was 29. A Hartford Fire Department report appears to record Plaintiff's blood sugar as "24," "27," or "29." (Doc. 98-18, Doc. 98-37 at 6.) A separate report from the Hartford Fire Department recorded Plaintiff's blood sugar level at 27. (Doc. 98-37 at 1.)[20] During the March 2010 incident, a blood sugar level of 24 rendered Plaintiff unconscious and responsive only to painful and loud stimuli, and the attending EMT on that call described a blood sugar level of 24 as "unconscious." (Doc. 98-34 at 3-4; Robishaw Dep. at 27:22-28:2.)

It is likewise disputed whether the officers reasonably believed Plaintiff was capable of complying with their commands. Sergeant Moody stated that he believed their commands "weren't clicking" with Plaintiff because he was in a "stupor or something." (Doc. 98-15 at 5.) At the scene, Officer Peyton commented that it seemed like Plaintiff

---

[20] Treatment records from the hospital recorded Plaintiff's blood sugar on the scene at 24 and 27. (Doc. 98-20 at 1, 5.)

was "way out of it." (Tr. at 15:4-5.) He also did not think that Plaintiff was "deliberately disobeying" him because he assumed Plaintiff was on drugs. (Doc. 84-5 at 31, Peyton Dep. at 62:1-6.) Officer Adams commented at the scene that Plaintiff "freaked out because he doesn't know what's going on," (Tr. at 24:2-3), and in conferring with Officer Peyton about what had transpired inside, she stated that Plaintiff was "all f***ed up" and did not "even know what he was doing." (Tr. at 31:22, 32:20-22.)

The degree of smoke inside Plaintiff's residence is disputed as is its location. Officer Adams stated that it was very smoky on the first floor and that they could "see smoke in the doorway" and "right at the top of the doorway" when "standing at the bottom of the stairs[.]" (Doc. 84-8 at 5-6, Adams Dep. at 18:3-9, 19:2-4.) Officer Peyton described that there was no smoke on the first floor and only "some smoke" on the second floor. (Doc. 84-5 at 21, Peyton Dep. at 43:2-14.) The officers all stated that the degree of smoke on the third floor made it very hard to see and to locate the source of the smoke. The officers could nonetheless all see Plaintiff sweating profusely and note that his eyes were either rolling back in his head or engaged in an empty stare.

The Hartford firefighters who responded to the scene also provide varying descriptions of it. One of the EMTs who observed the inside of Plaintiff's residence before attending to Plaintiff stated there was only a "small fire" on the third floor. (Doc. 98-34 at 8, Robishaw Dep. at 40:22-23.) Another fire fighter and EMT, Mr. Mariotti, described that on the second floor he "could smell something burning and there was a very light haze of smoke[,]" which he had "no problem" seeing through and which he described as "very light bluish." (Doc. 98-24 at 2-3, Mariotti Dep. at 15:23-16:1.) He observed on the third floor "a light haze of smoke" and that the carpet and alarm clock were smoldering. (Doc. 98-24 at 5, Mariotti Dep. at 18:15-18.) He opined that the type of smoldering he observed would cause smoke to "get heavier with time if it's continuing to burn." (Doc. 98-24 at 6, Mariotti Dep. at 20:16-17.) It is unclear whether the smoke would have been heavier or lighter prior to Mr. Mariotti's observation because Mr. Mariotti believed that he opened the bedroom windows after Plaintiff was removed from

the residence, while Sergeant Moody believed that he opened the windows after handcuffing Plaintiff and before removing Plaintiff from the residence.

## III.   Conclusions of Law and Analysis.

### A.   Standard of Review.

A movant is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists and must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986) (citation and internal quotation marks omitted); *see also FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994).

A genuine issue of material fact is one that 'might affect the outcome of the suit under the governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.'" *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004) (internal quotation marks omitted).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### B.   Qualified Immunity.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the

challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

With regard to the first prong, the "Fourth Amendment protects individuals from the government's use of excessive force when detaining or arresting individuals." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). "In order to establish that the use of force to effect an arrest was unreasonable and therefore a violation of the Fourth Amendment, plaintiffs must establish that the government interests at stake were outweighed by 'the nature and quality of the intrusion on [plaintiffs'] Fourth Amendment interests.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

With regard to the second prong, in order to establish that a right is "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004). To establish that an officer's conduct violates clearly established law, the court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083.

An officer may be protected by qualified immunity even where the officer makes a reasonable mistake of law or fact, or both. *See Messerschmidt v. Millender*, 132 S. Ct. 1235, 1249 (2012) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments.") (internal quotation marks omitted); *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011) (holding "qualified immunity protects government officials when they make reasonable mistakes about the legality of their

actions and applies regardless of whether the government official's error is a mistake of
law, a mistake of fact, or a mistake based on mixed questions of law and fact") (citations
and internal quotation marks omitted).

Defendants also seek qualified immunity for Plaintiff's claims arising under state
law. "[T]he substantive law of Vermont governs the applicability of qualified immunity
to [the plaintiff's] state law claims." *Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir.
1991).

> [O]nce the issue [of qualified immunity is] raised, [the plaintiff] ha[s] the
> burden to rebut the qualified immunity defense "by establishing that the
> official's allegedly wrongful conduct violated clearly established law. We
> do not require that an official demonstrate that he did not violate clearly
> established federal rights; our precedent places that burden upon plaintiffs.

*Sprague v. Nally*, 2005 VT 85, ¶ 4 n.3, 178 Vt. 222, 882 A.2d 1164 (internal quotation
marks omitted) (quoting *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997)).

Under Vermont law, "[q]ualified immunity attaches to public officials who are (1)
acting during the course of their employment and acting, or reasonably believing they are
acting, within the scope of their authority; (2) acting in good faith; and (3) performing
discretionary, as opposed to ministerial, acts." *Baptie v. Bruno*, 2013 VT 117, ¶ 11, 195
Vt. 308, 314, 88 A.3d 1212, 1216 (internal quotation marks omitted). "Thus, if the
official's conduct does not violate clearly-established rights of which a reasonable person
would have known, the official is protected by qualified immunity from tort liability."
*Sprague*, 2005 VT 85, ¶ 4, 178 Vt. at 226, 882 A.2d at 1168 (quoting *Cook v. Nelson*,
712 A.2d 382, 384 (Vt. 1998)).

### C.    Whether the Disputed Issues of Fact Preclude Summary Judgment.

When "the factual record is not in serious dispute . . . [,] [t]he ultimate legal
determination whether . . . a reasonable police officer should have known he acted
unlawfully is a question of law better left for the court to decide." *Lennon v. Miller*, 66
F.3d 416, 421 (2d Cir. 1995) (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990),
*cert. denied*, 498 U.S. 967 (1990)). "The rule requiring the judge to resolve questions of
reasonableness on summary judgment in qualified immunity cases where the material

facts are not in dispute is consistent with the doctrine's purpose of providing immunity from suit, as well as a defense to liability." *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985)).

In contrast, where the underlying facts are disputed, the jury must first determine the facts which the judge must then rely on to determine whether qualified immunity is available. *See Finnegan v. Fountain*, 915 F.2d 817, 821 (2d Cir. 1990) ("Once disputed factual issues are resolved, the application of qualified immunity is . . . ultimately a question of law for the court to decide.").

Although Plaintiff identifies a number of disputed facts, not all of those facts are material in a determination of his claims. "Factual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby, Inc.*, 477 U.S. at 248. "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.*

In this case, the court has some means of resolving certain factual disputes because where is a discrepancy between the parties' versions of the facts and a recording of the incident, a court may rely on an unaltered video or audio recording. *See Scott v. Harris*, 550 U.S. 372, 379-80 & n.5 (2007) (directing that a court ruling on a motion for summary judgment must "allow the videotape to speak for itself" and that the court should not adopt a "version of the facts" that is "blatantly contradicted" by the videotape); *MacLeod v. Town of Brattleboro*, 2012 WL 1928656, at *4 (D. Vt. May 25, 2012) ("In assessing whether there are triable issues of fact, the court may rely on facts as depicted in an unaltered videotape and audio recording, even when such facts contradict those claimed by the nonmoving party."), *aff'd*, 548 F. App'x 6 (2d Cir. 2013); *see also Kalfus v. N.Y. & Presbyterian Hosp.*, 476 F. App'x 877, 881 (2d Cir. 2012) (finding, in an excessive force claim, plaintiff's "challenges to this documentary [video] evidence are unavailing."). In this case, however, the unaltered video and audio recording provides only a partial depiction of what transpired, and even the transcript of the audio recording is contested. Notwithstanding Defendants' assertion that, for purposes of the pending motions, they concede to Plaintiff's version of the events, their argument that the officers

"violated no clearly established law and . . . acted reasonably at all times" depends at least to some extent on the court's adoption of Defendants' version of the facts. (Doc. 83 at 2.)

The officers' accounts of what occurred within Plaintiff's residence vary considerably and appear at odds with Plaintiff's medical condition at the time. Because Plaintiff has no memory of the incident, "the court may not simply accept what may be a self-serving account by the police officer" but must consider "circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (internal quotation marks omitted) (citing, in part, *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), and *Maravilla v. United States*, 60 F.3d 1230, 1233-34 (7th Cir. 1995) (directing that when "the witness most likely to contradict the officers' testimony" cannot testify, then a court should "examine all the evidence to determine whether the officers' story is consistent with other known facts")).

In other words, a district court "must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer[,] and the available physical evidence . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Scott*, 39 F.3d at 915; *see also Mayo v. Winn*, 2009 WL 8103582, at *7 (Vt. Sup. Ct. May 14, 2009) (acknowledging "the dilemma inherent in excessive force cases when the only available eye-witness testimony is from the defendant officers" and the "importance" of analyzing other evidence in the record). In doing so, the court is not entitled to make its own credibility determinations or determine which version of the facts it finds most persuasive. *See McClellan v. Smith*, 439 F.3d 137, 148 (2d Cir. 2006) ("'Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.'") (quoting *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994)).

In the light most favorable to Plaintiff, the officers' accounts of what transpired within Plaintiff's residence are sufficiently at odds internally and with the other evidence

in the record to require a jury determination. *See Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (directing that on a motion for summary judgment a "district court is required to resolve all ambiguities . . . in favor of the party against whom summary judgment is sought"). For example, the officers claim that while Plaintiff sat naked and sweating profusely on a toilet with a blank stare (or with his eyes rolled back in his head) in what appeared to be a drug-induced stupor, he was nonetheless reaching behind a vanity or concealing his hand behind a vanity and thus potentially reaching for a weapon. On its face, the claim appears incredible and inconsistent with not only the medical evidence regarding Plaintiff's condition at the time, but also with the officers' descriptions of Plaintiff's condition at the time. A jury must therefore weigh the evidence and determine whether the officers actually held a reasonable belief that Plaintiff was potentially reaching for a weapon.

The officers' use of pepper spray poses a similar challenge. The officers claim that they needed to spray Plaintiff twice in the face in a confined location in order to subdue him and gain his compliance. It is undisputed that Plaintiff failed to comply with the officers' commands even when those commands were delivered at gunpoint. However, some of the officers have acknowledged that, at the time, Plaintiff was not capable of understanding their commands or complying with them. In the face of such a belief, the officers' almost immediate decision to spray Plaintiff twice in the face with pepper spray in order to gain his compliance may be unreasonable.[21] *See Adams v. Metiva*, 31 F.3d 375, 384-85 (6th Cir. 1994) (ruling district court erred in making factual findings on summary judgment and that, if as a result of the deployment of mace, a plaintiff "could not see, was groping around, and had his hands up in front of his face[,]" further use of mace may be unreasonable). A jury must therefore decide whether the officers' use of pepper spray was in response to a non-compliant individual's efforts to

---

[21] The officers' use of pepper spray in the confined space of a third floor bathroom against an incapacitated individual who was not actively resisting was not only arguably a violation of Hartford's use of force policy, but appears unsupported by the officers' further testimony that Plaintiff had engaged in no violent or threatening behavior towards them before the pepper spray was deployed.

potentially reach for a weapon or a gratuitous use of force against an incapacitated individual who was incapable of compliance and who posed no immediate threat. *See Tracy v. Freshwater*, 623 F.3d 90, 98-99 (2d Cir. 2010) (explaining that the use of pepper spray "on an arrestee has a variety of incapacitating and painful effects, and, as such, its use constitutes a significant degree of force" and it "should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer" and noting that the right to be free of gratuitous force is "clearly established") (internal citation omitted); *see also Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 60 (1st Cir. 2008) (ruling that "mere obstinance by a crowd, without any evidence of a potential public safety threat or other law enforcement consideration, is insufficient to warrant [a] show of force" consisting of the use of pepper spray to gain compliance).

The facts surrounding the "fight" within Plaintiff's residence are perhaps the most challenging obstacle to a qualified immunity determination as they depend almost entirely on the officers' credibility; the events are only minimally reflected on the audio recording and are entirely absent from the video recording. The officers claim they repeatedly struck Plaintiff (who at that time was naked, unarmed, and still incapacitated by the pepper spray) with a baton because he became aggressive towards them, and in particular, towards Officer Adams. They, however, provide scant evidence of Plaintiff's alleged aggression, describing it as Plaintiff approaching them, falling on them or on the floor, and landing on top of, standing over, or straddling Officer Adams. *See Sullivan v. Gagnier*, 225 F.3d 161, 165-66 (2d Cir. 2000) ("The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit."). Not only are the officers' accounts of Plaintiff's alleged aggression inconsistent, but their abrupt shift to solicitude when they discovered Plaintiff was the homeowner calls into question whether they actually believed Plaintiff had just attacked them. In such circumstances, Plaintiff's status as the homeowner would arguably be irrelevant.

In the light most favorable to Plaintiff, the officers' self-congratulatory comments about the "fight" immediately after it occurred, the statement that their lives were more important than Plaintiff's, and evidence that Plaintiff was on top of Officer Adams for no more than a second support an inference that Plaintiff's continued non-compliance rather than fear for their own safety caused them to "fight" with Plaintiff and strike him with their batons. Where the reasonable inferences to be drawn from the facts are conflicted, a jury must evaluate the officers' credibility, weigh the competing inferences, and determine whether the use of force "was unreasonable under the circumstances." *Tracy*, 623 F.3d at 99 (noting that the district court "erred in taking that issue away from a jury at the summary judgment stage.").[22]

Finally, as the crux of their qualified immunity defense, Defendants claim that they had probable cause, or arguable probable cause, to arrest Plaintiff for an array of crimes and thus their use of force was reasonable as a matter of law. When the facts establishing probable cause are disputed, the court must submit to the jury "only the question as to the existence of those facts" together "with instructions as to what facts will amount to probable cause if proved[.]" *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (quoting *Dir. Gen. of R.Rs. v. Kastenbaum*, 263 U.S. 25, 28 (1923) and *Sanders v. Palmer*, 55 F. 217, 220 (2d Cir. 1983)). The question of probable cause thus becomes a mixed question of law and fact which cannot be resolved on summary judgment. *Id.*

---

[22] If a jury finds that the officers exaggerated or fabricated the threat posed by Plaintiff in order to justify their use of force, this, alone, may be a basis for the denial of qualified immunity. *See Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) (denying "entitlement to qualified immunity as a matter of law" in the face of claim that officer "fabricated a parole violation and arrested [plaintiff] knowing he lacked probable cause to do so. Such conduct, if proved, would plainly violate [plaintiff's] clearly established right to be free from arrest in the absence of probable cause."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (reversing grant of summary judgment because "plaintiffs' evidence could support the view" that defendants cooperated in an unlawful arrest and then "falsif[ied] the circumstances, although they knew there was no probable cause to justify the arrest."); *Golino v. City of New Haven*, 950 F.2d 864, 871-72 (2d Cir. 1991) (holding summary judgment is unavailable where a jury must decide whether officers who intentionally omitted exculpatory information from affidavit could therefore reasonably rely on resulting arrest warrant).

Notwithstanding the foregoing, some of Plaintiff's claims may still be disposed of on summary judgment as Plaintiff cannot establish the essential elements of those claims as a matter of law. *See Celotex Corp.*, 477 U.S. at 322 (directing that Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### D.    Whether Plaintiff's Section 1983 Claims Against the Individual Officers Should be Dismissed.

In order to prevail in a claim brought under 42 U.S.C. § 1983, Plaintiff must establish (1) actions taken under color of law; (2) a deprivation of a constitutional or statutory right; (3) causation; and (4) damages. *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010). Defendants do not challenge Plaintiff's allegation that they were acting under color of law, however, all other elements of Plaintiff's § 1983 claim are contested.[23]

### 1.    Plaintiff's Excessive Force Claim.

In Count One of his Second Amended Complaint, Plaintiff asserts that the individual officers used unreasonable and excessive force during the incident on May 29, 2010. (Doc. 43 at 11-12.) A § 1983 "claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014).

The "proper application" of the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case[.]" *Graham*, 490 U.S. at 396. "[T]he 'reasonableness' inquiry in an excessive force case is an objective one [as] the

---

[23] Although Defendants claim any injury Plaintiff suffered was *de minimus*, the Second Circuit has refused to find an injury "insufficiently serious" when it is clear that the plaintiff suffered pain and at least some physical injury caused by the officers' use of force. *See Maxwell v. City of New York*, 380 F.3d 106, 109-10 (2d Cir. 2004) (reversing grant of summary judgment in officer's favor where plaintiff alleged officer's use of force "was sufficient to send pains into her arm and lower back and leave her with post-concussive syndrome."). Here, that threshold is easily satisfied as Plaintiff was pepper sprayed twice, beaten with multiple strikes of a baton, and suffered a laceration which required stitches and caused scarring.

question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* It "involves the consideration of factors such as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Terranova v. New York*, 676 F.3d 305, 308 (2d Cir. 2012) (internal quotation marks omitted).

The court has ruled that the underlying facts must be determined before the court can conclude, as a matter of law, that the officers' use of force was objectively reasonable. *See Brown v. City of New York*, 2015 WL 4924395, at *7 (2d Cir. Aug. 19, 2015) (denying qualified immunity on excessive force claim and observing that "court's role in considering excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive" and leaving "factual determination" to the jury); *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003) (observing that court cannot find officers are entitled to qualified immunity as a matter of law where the reasonableness of the force "turns on which of two conflicting stories best captures what happened . . . making summary judgment inappropriate") (citation omitted).

Because the individual officers have not established that the undisputed facts demonstrate their entitlement to qualified immunity on Plaintiff's excessive force claim, Defendants' motion for summary judgment with regard to Count One must be DENIED.

### 2.    Plaintiff's False Arrest and Unlawful Restraint Claims.

Defendants fare better with their argument that Plaintiff cannot establish the essential elements of his false arrest claims. In Count Two of his Second Amended Complaint, Plaintiff asserts that the individual officers "concertedly, unlawfully, and maliciously" detained and confined Plaintiff. (Doc. 43 at 12-13.) In Count Three he asserts that the individual officers "concertedly, unlawfully, and maliciously" arrested Plaintiff. (Doc. 43 at 13-14.)

A § 1983 claim for false arrest (or detention) requires a plaintiff to "demonstrate that defendant intended to confine him, he was conscious of the confinement, he did not consent to the confinement, and the confinement was not otherwise privileged." *Shain v. Ellison*, 273 F.3d 56, 67 (2d Cir. 2001). Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff. *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).

In this case, Plaintiff claims that during the events that took place inside his residence "[h]is blood sugar levels had plummeted dangerously low rendering him comatose." (Doc. 98-1 at 1.) The video recording reveals that at the time Plaintiff appeared to regain consciousness on the sidewalk in front of his home, he had free use of his hands and was otherwise unrestrained by the officers. Plaintiff concedes that he has no memory of the events in question and thus he will be unable to testify at trial that he was conscious of his confinement. In such circumstances, summary judgment is appropriate because "[i]t is generally held that the plaintiff in a false imprisonment action must be aware or conscious of the confinement." *In re Carvalho*, 2009 WL 4828726, at *6 (Bankr. E.D. Mich. Dec. 9, 2009) (internal quotations omitted); *Carr v. Devereux Found., Inc.*, 1995 WL 541799, at *5 (Conn. Super. Ct. 1995) (ruling that for a false arrest claim, plaintiff "must also show that she was aware or conscious of the confinement"); *Harrer v. Montgomery Ward & Co.*, 221 P.2d 428, 433 (Mont. 1950) (holding there can be no false arrest "where the person sought to be arrested is not conscious of any restraint of his liberty" or "under the belief and impression that he was subject to the actual control or will of defendants or any one else" and "[t]here is no liability for intentionally confining another unless that person knows of the confinement."). This rule "gives recognition to the fact that false imprisonment, as a dignitary tort, is not suffered unless its victim knows of the dignitary invasion." *Parvi v. City of Kingston*, 41 N.Y.2d 553, 556-57 (N.Y. 1977) (citation omitted).

Because Plaintiff cannot establish the essential element of his consciousness of confinement, he cannot establish an essential element of his false arrest claims against the

individual officers.  Defendants' motion for summary judgment with regard to Counts
Two and Three is therefore GRANTED.[24]

### E.    State Law Claims Against the Individual Officers.

#### 1.    Assault and Battery (Count Eleven).

Under Vermont law, battery "is an intentional act that results in harmful contact
with another." *Christman v. Davis*, 2005 VT 119, ¶ 6, 179 Vt. 99, 101, 889 A.2d 746,
749 (citing Restatement (Second) of Torts § 13 (1965)).  "At common law, the civil tort
of assault is defined as any gesture or threat of violence exhibiting an [intention] to
assault, with the means of carrying that threat into effect . . . unless immediate contact is
impossible." *MacLeod v. Town of Brattleboro*, 2012 WL 5949787, at *8 (D. Vt. Nov. 28,
2012) (internal quotation marks omitted); *see also Bishop v. Ranney*, 7 A. 820, 820-21
(Vt. 1887) ("And any gesture or threat of violence exhibiting an intention to assault, with
the means of carrying that threat into effect, is an assault, unless immediate contact is
impossible.") (internal quotation marks omitted).

"When assault and battery is alleged against police officers, 'the inquiry is
whether the officer's conduct was reasonably necessary and thereby privileged.'"
*Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 417 (D. Vt. 2009), *aff'd*, 400 F. App'x 592
(2d Cir. 2010) (quoting *Smith v. District of Columbia*, 882 A.2d 778, 788 (D.C. 2005)).
Police officers are privileged to use force in arresting a suspect, but the privilege "ends
when the force used is excessive, which is determined using the same standards used to
analyze a Fourth Amendment excessive force claim." *Mayo*, 2009 WL 8103582.

Because the court cannot determine based on the undisputed facts whether the
officers' use of force was reasonable under the circumstances, the court cannot grant the
officers judgment as a matter of law on Plaintiff's claims of assault and battery. *See*
*Bombard v. Volp*, 2014 WL 4411601, at *10 (D. Vt. Sept. 8, 2014) (addressing state law
claim of battery in case alleging officers used excessive force when tasering plaintiff and

---

[24] The court thus does not address whether the officers had probable cause to arrest Plaintiff.  In
declining to address this issue, the court notes that the facts of what occurred inside Plaintiff's
residence are contested and that there is no reasonable basis to conclude the officers had
probable cause to arrest Plaintiff before they entered his residence.

concluding: "Because the questions of excessive force and reasonableness are matters for the jury in this case, the Court cannot grant summary judgment on the state law battery claim."). Defendants' motion for summary judgment on Count Eleven is therefore DENIED.

### 2.    Intentional Infliction of Emotional Distress (Count Nine).

"To sustain a claim for [intentional infliction of emotional distress,] plaintiff must show defendants engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Fromson v. Vermont*, 2004 VT 29, ¶ 14, 176 Vt. 395, 399, 848 A.2d 344, 347 (internal quotation marks omitted).

"A plaintiff's burden on a claim of [intentional infliction of emotional distress] is a heavy one." *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390, 398 (Vt. 2002) (internal quotation marks omitted). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Denton v. Chittenden Bank*, 655 A.2d 703, 706 (Vt. 1994) (internal quotation marks and ellipses omitted). "The test is objective; the plaintiff must show that the harm resulting from the inflicted distress was so severe that no reasonable person could be expected to endure it." *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995). The Vermont Supreme Court has "declined to find outrageous conduct based solely on the alleged illegal motives underlying the conduct[,]" *Fromson*, 2004 VT 29, ¶ 18, 176 Vt. at 401, 848 A.2d at 349.

In the light most favorable to Plaintiff, although a close question, the court cannot conclude that, "as a matter of law," the conduct in question did not "reach the level of extreme outrage necessary" because a rational jury could conclude that the officers' use of force against Plaintiff was gratuitous and took place at a time when the officers either knew or reasonably should have known that Plaintiff was incapacitated. *See Denton*, 655 A.2d at 706 (directing that summary judgment is appropriate only if the alleged conduct "did not, as a matter of law, reach the level of extreme outrage"). Defendants' motion for

judgment as a matter of law on Count Nine must therefore be DENIED until the underlying facts are determined.

### F. Negligence Claims Against Hartford and the Individual Officers.

Plaintiff asserts a claim against Hartford for the negligence of the individual officers (Count Six) and a claim against Hartford for the negligence of Chief Cutting (Count Seven), as well as a claim against the individual officers and Hartford for negligent infliction of emotional distress (Count Ten).

Pursuant to 24 V.S.A. § 901(a), an action against "any appointed or elected municipal officer" must be "brought in the name of the town in which the officer serves[.]" The vast majority of Plaintiff's claims against Defendants allege intentional acts that do not give rise to claims sounding in negligence. *See Sarnicola v. Cty. of Westchester*, 229 F. Supp. 2d 259, 276-77 (S.D.N.Y. 2002) (concluding that claims of "false arrest, false imprisonment and unconstitutional search (or its attendant torts, assault and battery) are not acts of negligence, and plaintiff cannot recover for them under general principles of [New York] negligence law"); *DiGennaro v. Town of Gates Police Dep't*, 2013 WL 3097066, at *17 (W.D.N.Y. June 18, 2013) (noting that claims of "intentional conduct, namely excessive force" are not claims for negligence).

Under Vermont law, a claim of negligence requires proof that the defendant owed the plaintiff a legal duty, that the defendant breached that duty, that the breach was the proximate cause of the injuries the plaintiff suffered, and that the plaintiff suffered actual loss or damage. *See Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63, 67, 968 A.2d 336, 340. Duty "is central to a negligence claim, and its existence is primarily a question of law." *Id.* at ¶ 11, 185 Vt. at 68, 968 A.2d at 340; *see also Lenoci v. Leonard*, 2011 VT 47, ¶ 9, 189 Vt. 641, 642, 21 A.3d 694, 697 (ruling that to maintain a negligent infliction of emotional distress claim, which "sound[s] in negligence," a plaintiff must establish that the defendant or defendants owed plaintiff a duty).

A governmental actor owes a duty of care "toward specified persons above and beyond [his or her] duty to the public at large" based on the following considerations:

> (1) whether a statute sets forth mandatory acts for the protection of a
> particular class of persons; (2) whether the government has knowledge that
> particular persons within that class are in danger; (3) whether those persons
> have relied on the government's representations or conduct; and (4)
> whether the government's failure to use due care would increase the risk of
> harm beyond what it was at the time the government acted or failed to act.

*Sabia v. Vermont*, 669 A.2d 1187, 1191 (Vt. 1995).

In this case, Plaintiff cites no statute that sets forth mandatory acts for the protection of a particular class of persons of which Plaintiff was a member. The Vermont Supreme Court has addressed a plaintiff's claim that a VSP trooper failed "to properly investigate a reported incident of domestic abuse against plaintiff that continued after the trooper left the scene." *Kane v. Lamothe*, 2007 VT 91, ¶ 1, 182 Vt. 241, 243, 936 A.2d 1303, 1305. Explaining that a governmental actor takes on "a special duty of care to a specific person beyond that extended to the general public" only when a statute "sets forth mandatory acts for the protection of a particular class of persons," the Vermont Supreme Court concluded that the statutes governing the VSP did not "create [a] special relationship between crime victims and law enforcement personnel" and did not "set forth any mandatory acts, much less mandatory acts for the protection of a particular class of persons[,]" apart from the officer's duties "owed to the community as a whole." *Kane*, 2007 VT 91, ¶ 9, 182 Vt. at 246-47, 936 A.2d at 1307-08.

Here, Vermont law provides that municipal police officers "shall have the same powers as sheriffs in criminal matters and the enforcement of the law and the same powers, immunities, and matters of defense in serving criminal and civil process." 24 V.S.A. § 1935. Vermont law further provides that the chief of police "shall be a police officer" and is "vested" with the "direction and control of the entire police force[.]" 24 V.S.A. § 1931(a), (b). The state statutes governing municipal police officers and police chiefs thus impose only duties "owed to the community as a whole." *Kane*, 2007 VT 91, ¶ 9, 182 Vt. at 246-47, 936 A.2d at 1308. For this reason, courts decline to find that "police officers owe criminal suspects a duty to investigate beyond establishing probable cause prior to arrest." *Lahm v. Farrington*, 90 A.3d 620, 623, 626 (N.H. 2014); *see also*

*Smith v. Iowa*, 324 N.W.2d 299, 300 (Iowa 1982) (observing that courts have uniformly rejected a cause of action for negligent criminal investigations by police officers) (collecting cases); *Pourny v. Maui Police Dep't*, 127 F. Supp. 2d 1129, 1146 (D. Haw. 2000) ("There is no 'duty' to not arrest without probable cause.").

In the alternative, Plaintiff contends that the officers owed him a duty of care when they undertook an investigation of the premises based, in part, on the report of a fire inside his residence. The Vermont Supreme Court has held that an officer may have a duty based on "a threshold showing that there existed an undertaking to render services for another for the protection of a third party and . . . a showing that this undertaking increased the risk of harm or . . . a showing that harm was suffered because of reliance on the undertaking." *Kennery v. Vermont*, 2011 VT 121, ¶ 14, 191 Vt. 44, 53, 38 A.3d 35, 40 (citing Restatement (Second) of Torts § 324A (1965)). "[V]ery little action on the part of the defendants is required to constitute an undertaking" and "a promise to do something may be sufficient." *Id.* (internal quotation marks omitted).

In *Kennery*, the defendant officers agreed to undertake a welfare check, "not only by promising to do so, but also by following up on their promise, taking concrete actions to perform the welfare check, and following up on their performance with [the person who requested it]." *Id.* In contrast, in this case, there is no evidence that the individual officers or Chief Cutting promised Plaintiff anything. The instant case thus falls squarely outside of *Kennery*'s embrace as there can be no reasonable claim that, during the incident, the officers were rendering services for the protection of Plaintiff after promising to fulfill this undertaking.

Because Plaintiff cannot establish that Hartford, its officers, or Chief Cutting owed Plaintiff a specific duty beyond duties owed to the public at large, Plaintiff fails to establish an essential element of his negligence claims—a duty owed to him by Defendants. *See Celotex Corp.*, 477 U.S. at 322. The court thus need not reach Defendants' alternative arguments for dismissal of Plaintiff's negligence claims. Defendants' motion for summary judgment on Counts Six, Seven, and Ten is therefore GRANTED.

### G.     Plaintiff's Section 1983 Claims Against Hartford and Chief Cutting.

In Count Four of his Second Amended Complaint, Plaintiff asserts claims against

Hartford for establishing and maintaining customs, policies, or practices which gave rise

to violations of Plaintiff's constitutional rights. In Count Five he seeks to impose

supervisory liability on Chief Cutting for the individual officers' actions. "Under the

standards of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a

municipality can be held liable under [42 U.S.C. § 1983] if the deprivation of the

plaintiff's rights under federal law is caused by a governmental custom, policy, or usage

of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012).

Liability under § 1983 "is imposed on the municipality [only] when it has promulgated a

custom or policy that violates federal law and, pursuant to that policy, a municipal actor

has tortiously injured the plaintiff." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir.

2013). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a

*respondeat superior* basis for the tort of its employee." *Jones*, 691 F.3d at 80. Thus, for

a municipality to be held liable under § 1983 for the unconstitutional actions of its

employees, "a plaintiff is required to plead and prove three elements: (1) an official

policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a

constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)

(internal quotation marks omitted).

"Supervisory liability is a concept distinct from municipal liability, and is

'imposed against a supervisory official in his individual capacity for his own culpable

action or inaction in the training, supervision, or control of his subordinates.'" *Kucera v.

Tkac*, 2013 WL 1414441, at *4 (D. Vt. Apr. 8, 2013) (quoting *Odom v. Matteo*, 772 F.

Supp. 2d 377, 403 (D. Conn. 2011)). Prior to the Supreme Court's decision in *Ashcroft v.

Iqbal*, 556 U.S. 662 (2009), the Second Circuit required a plaintiff to allege one of the

following categories for supervisory liability under § 1983:

> (1) the defendant participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong, (3) the defendant created a
> policy or custom under which unconstitutional practices occurred, or

allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Plaintiff asserts his claims against Chief Cutting under the second, third, and fifth *Colon* factors.

In order to succeed on his *Monell* and supervisory liability claims, Plaintiff must first "identify obvious and severe deficiencies" in the policies of the Hartford Police Department and "show a causal relationship" between those deficiencies and his alleged deprivations. *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). Plaintiff argues that Chief Cutting is responsible for creating, implementing, and enforcing the policies of the Hartford Police Department and that the Department's Use of Force Policy provides no instruction or limitation on the use of OC spray on individuals who are unresponsive (regardless of whether they are unresponsive because they are sick or on drugs). Plaintiff thus contends that the use of OC spray in a confined space and while he was unresponsive constituted an unreasonable use of force that violated his constitutional rights. When regarded in the light most favorable to him, Plaintiff has thus identified arguable deficiencies in the policies of the Hartford Police Department that have some connection to the alleged deprivations of his constitutional rights.

However, to the extent that Plaintiff premises his claims on a failure to train or supervise, such failure "may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195. Similarly, Chief Cutting is liable only for the creation or continuation of policy that leads to a pattern of unconstitutional conduct or if he demonstrated deliberate indifference in failing to act on information that a pattern of unconstitutional conduct was occurring. *See Colon*, 58 F.3d at 873.

"To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed

to take appropriate action to prevent or sanction violations of constitutional rights."
*Jones*, 691 F.3d at 81.

> A pattern of similar constitutional violations by untrained employees is
> "ordinarily necessary" to demonstrate deliberate indifference for purposes
> of failure to train [or supervise because] [w]ithout notice that a course of
> training is deficient in a particular respect, decisionmakers can hardly be
> said to have deliberately chosen a training program that will cause
> violations of constitutional rights.

*Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (quoting *Bd. of Cty. Comm'rs of
Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). "[W]hen city policymakers are on
actual or constructive notice that a particular omission in their training program causes
city employees to violate citizens' constitutional rights, the city may be deemed
deliberately indifferent if the policymakers choose to retain that program." *Id.*

In this case, there is no evidence of prior lawsuits or complaints of excessive force
based on the use of pepper spray and only one prior "question regarding the use of
[pepper spray]" during which a suspect had taken a child into a room, the officers were
concerned for the safety of the child, and the officers sprayed the suspect through a crack
in the door rather than force their way into the room. (Doc. 84 at 27-28, ¶¶ 200, 203.)
This isolated incident is insufficient to establish that the Hartford Police Department and
Chief Cutting were on notice that their training and supervision was deficient in the
"particular respect" Plaintiff contends violated his constitutional rights. *Connick*, 131 S.
Ct. at 1360; *see also Plair v. City of New York*, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011)
("[I]t is well established that a single incident does not give rise to an unlawful practice
by subordinate officials so permanent and well-settled as to constitute custom or usage.")
(internal quotation marks omitted); *Giaccio v. City of New York*, 308 F. App'x 470, 472
(2d Cir. 2009) (finding that allegations of, at most, four prior incidents of misconduct
"falls far short of establishing a practice that is 'so persistent or widespread' as to justify
the imposition of municipal liability") (internal quotation marks omitted).

Plaintiff nonetheless contends that "post-event evidence is highly probative" of
deliberate indifference and notes two complaints of excessive force arising after the May

2010 incident: a September 2010 incident during which Hartford police officers responding to a domestic abuse call had physical contact with the complainant and the complainant suffered a head laceration (Doc. 98-35), and a June 2011 incident during which Hartford police officers entered a man's home, removed him from his home, and forcibly handcuffed him in his driveway after a report of a minor traffic accident. (Doc. 98-36.) While the alleged conduct of the Hartford police officers involves claims of excessive force, "reports of misconduct [that] were made after the events of which Plaintiff complains" could not have "put policymakers on notice of a developing *de facto* policy." *Kucera*, 2013 WL 1414441, at *9. Post-event incidents of excessive force thus do not provide a basis for Plaintiff's *Monell* claims.

Plaintiff gains no further traction in arguing that proof of an unconstitutional policy can be inferred from the fact that the Hartford Police Department and Chief Cutting "endorse[d] the Officers' actions as consistent with Town policies" after the incident, rather than admitting "that its Officers' actions were unreasonable and violated Town policies and procedures[.]" (Doc. 98-1 at 45.) In this respect, Plaintiff seeks to impose liability on Hartford and Chief Cutting based on the incident in question. However, "a plaintiff cannot establish municipal liability solely by inference from evidence of the occurrence of the incident in question." *Bourn v. Town of Bennington*, 2012 WL 2396875, at *3 (D. Vt. June 25, 2012); *see also Anderson v. City of New York*, 657 F. Supp. 1571, 1574 (S.D.N.Y. 1987) ("Plaintiff cannot infer a policy from the alleged violation of his own civil rights.").

Because "isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability[,]" *Jones*, 691 F.3d at 81, judgment as a matter of law in Defendants' favor is appropriate. Defendants' motion for summary judgment on Counts Four and Five is therefore GRANTED. *See Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (affirming grant of motion to dismiss when plaintiff failed to demonstrate that an officer's alleged harassment and assault "occurred as a result of a municipal custom or policy" because there was no indication the city or

superiors knew of prior similar misconduct by that officer); *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992) ("A municipal agency may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees."); *see also Walker v. City of New York*, 63 F. Supp. 3d 301, 311-12 (E.D.N.Y. 2014) (noting that "[w]hen there is only one instance of the particular constitutional violation alleged by a plaintiff, it will ordinarily be insufficient to state a failure to supervise claim[,]" and granting motion for summary judgment when "the alleged unconstitutional conduct was limited to the actions" challenged in that case and plaintiffs had not "identified any additional, similar examples of unconstitutional practices beyond the events they complain[ed] of").

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART Defendants' motions for summary judgment. (Docs. 80 & 81.) The court GRANTS summary judgment in Defendants' favor with regard to Counts Two through Seven and Count Ten. The court DENIES summary judgment with regard to Count One, Count Nine, and Count Eleven.

As the court has previously dismissed Counts Eight and Twelve with Plaintiff's consent, only Plaintiff's § 1983 Excessive Force claim and his state law claims of assault and battery and intentional infliction of emotional distress remain for trial. Defendants' entitlement to judgment as a matter of law based on qualified immunity for those claims must await a jury determination of the underlying facts. *Finnegan*, 915 F.2d at 821. SO ORDERED.

Dated at Burlington, in the District of Vermont, this _14th_ day of September, 2015.

Christina Reiss, Chief Judge
United States District Court